# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| RICHARD WAYNE SOGA JR., | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:15-CV-215-PRC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
|     Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Richard Wayne Soga Jr. on June 4, 2015, and a Plaintiff's Brief in Support of Motion for Summary Judgment [DE 17], filed by Plaintiff on September 23, 2015. Plaintiff requests that the May 7, 2013 decision of the Administrative Law Judge denying his claim for disability insurance benefits and supplemental security income be reversed and remanded for further proceedings. On January 4, 2016, the Commissioner filed a response, and Plaintiff filed a reply on February 3, 2016. For the following reasons, the Court denies Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for supplemental security income on June 12, 2007, alleging disability since 1990. Following a hearing on March 17, 2010, an Administrative Law Judge ("ALJ") issued an unfavorable decision, which was appealed, and the Court vacated the decision and remanded for further proceedings. On December 17, 2012, ALJ Harry Kramzyk held a hearing. In attendance at the hearing were Plaintiff, Plaintiff's mother Diane Soga, an impartial vocational expert, and Plaintiff's attorney. On May 7, 2013, the ALJ issued a written decision denying benefits, making the following findings:

1.     The claimant has not engaged in substantial gainful activity since June 12, 2007, the application date.

2.     The claimant has the following severe impairment: Asperger's disorder.

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant can understand, remember, and carry out short, simple, repetitive instructions; the claimant is able to sustain attention/concentration for two-hour periods at a time, and for eight hours in the workday on short, simple, and repetitive instructions; the claimant can use judgment in making work decisions related to short, simple, and repetitive instructions; the claimant requires an occupation with only occasional coworker contact and supervision; the claimant requires an occupation with set routines and procedures and few changes during the workday; the claimant could have only superficial contact with the public on routine matters; the claimant cannot perform fast-pace production work; the claimant can maintain regular attendance, can perform activities within a schedule, and be punctual within customary tolerances.

5.     The claimant has no past relevant work.

6.     The claimant was born [in 1984] and was 22 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.     The claimant has at least a high school education and is able to communicate in English.

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.     The claimant has not been under a disability, as defined in the Social Security Act, since June 12, 2007, the date the application was filed.

(AR 562-78).

The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481. Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an

ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as

an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If no, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if no, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's residual functional capacity (RFC), age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. The RFC "is an administrative assessment of what work-related activities an individual can perform despite

[his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 885-86; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## BACKGROUND

*1.     Factual Background*

In 2003, more than four years before Plaintiff filed an application for benefits, Dr. Robert Coyle performed a neuropsychological evaluation of him. (AR 277). Plaintiff was a senior in high school, receiving special education assistance in reading. Dr. Coyle found him pleasant and cooperative; Plaintiff tested in the low average range on the Wechsler Adult Intelligence Scale-III. Plaintiff's capacity for abstraction and concept formation was intact, suggesting a "normal learning curve in being trained at a new job . . . . He should be flexible and adaptable on the job." (AR 282). His memory and localization test scores were "exceptional." (AR 283). His alertness and sustained concentration scores were normal to mildly impaired on the Seashore Rhythm and Speech-Sounds Perception test. On the Minnesota Multiphasic Personality Inventory-2, Plaintiff had moderately abnormal scores, with some problems in poor judgment, touchiness, and acting out. He appeared edgy, somewhat depressed and socially unforthcoming during testing, with a need for emotional support. Dr. Coyle saw a "mild degree of impairment" with good capacity for new learning, normal memory and adequate capacity for attention and concentration for vocational purposes.

For the next three years, there are no pertinent medical records. In June 2006, Plaintiff's mother expressed concerns about Plaintiff's inattention, social problems, and inability to find work

after finishing high school. (AR 293). On June 8, 2006, on a physical form, it is noted that Plaintiff had a normal mood, affect, memory, and judgment. Other examinations around this time showed a normal or euthymic mood, but a blunted affect. Plaintiff saw a licensed clinical social worker for stress management.

Beginning in December 2006, Plaintiff met with an employment specialist and received other state vocational rehabilitation services. (AR 309). Plaintiff had excellent participation and applied for many jobs in 2007. There are few records documenting abnormal mental status findings between 2006 and the benefits application date of June 12, 2007.

On August 24, 2007, Plaintiff had an internal medicine consultative examination with Dr. Saavedra, reporting agitation with loud noises and a short temper. (AR 328). Plaintiff denied any memory loss or concentration deficits. He was cooperative and understood basic commands without difficulty. Examination findings were normal.

On September 19, 2007, Plaintiff saw Dr. Rini for a psychological consultative examination. (AR 360). Plaintiff reported fixating on things, difficulty connecting emotionally, conflicts with peers, mood swings, and concentration problems. Plaintiff said he could focus better when on medication. He said he had friends but that they tended to drift away. Plaintiff reported working for Regis for one month until he quit because it was too much driving. He reported that his previous work as a dishwasher at Baker's Square ended after 18 months when he quit because his manager wanted him to do something that he did not want to do. On examination, he repeated six digits forward and three digits in reverse and could recall all three household items after five minutes. He correctly performed almost all math calculations and serial sevens. He had a blunted affect, but reported feeling alright. Dr. Rini's diagnosis included Asperger Syndrome and a GAF score of 57.

Dr. Rini opined that Plaintiff functioned in the normal range of intellectual ability, but was socially impaired, with below average concentration and average memory.

Four months later, on October 1, 2007, Dr. William Shipley, Ph.D., reviewed Plaintiff's disability claim file for the Bureau of Disability Determination Services and concluded that Plaintiff might be precluded from successfully handling complex changing tasks and would likely not do well working with the general public. Dr. Shipley also opined that Plaintiff retained the ability to complete simple repetitive tasks on a sustained basis without special consideration. He assessed a mild restriction in activities of daily living and moderate restrictions in social functioning and in maintaining concentration, persistence, or pace. (AR 378). On January 14, 2008, Dr. Joseph Pressner, Ph.D., reviewed Plaintiff's records and affirmed Dr. Shipley's medical opinion. (AR 383).

On April 10, 2008, Plaintiff had additional psychological testing. (AR 501). He reported that he did not have any friends because his friends from high school were either away at school or at work. (AR 501). He was somewhat shy, albeit friendly, speaking somewhat loudly and infrequently. He seemed slightly nervous and frustrated with the length of testing. IQ scores on the WAIS-III were just below average and the tester believed his Full Scale IQ score to be even higher than reported. Working memory was a strength. (AR 502). On the MMPI-2, Plaintiff expressed some depression, low self-esteem, introversion, social alienation, emotional alienation, and social insecurity. His overall profile was consistent with Asperger Syndrome. His GAF score was 55, consistent with moderate symptoms or functional limitations.

Initial therapy records with licensed clinical social worker Donna Ruebensam indicated flat or labile affect with depressed or elevated mood, albeit with attentive and cooperative behavior as well as good eye contact. (AR 453-60, 467-79). However, as of February and April 2008, he met

most of his therapeutic goals. (AR 469, 478). He appeared to be more motivated. (AR 464). During medication management checks, Plaintiff had a restricted affect, but smiled occasionally. (AR 461). Medication doses were stable. (AR 462). He reported leaving the home more often in August 2008 to meet people, run errands, and exercise. (AR 457). In October 2008, Plaintiff reported no behavioral problems and was euthymic with normal affect, fair memory and concentration, but some fixation on certain thoughts. (AR 448). He expressed a preference for being alone.

On December 20, 2008, Dr. Ellen Rozenfeld, an impartial expert psychologist, responded to ALJ Anglada's interrogatories. (AR 384-389). Dr. Rozenfeld reviewed Plaintiff's disability case file and opined that Plaintiff had mild difficulty with activities of daily living and moderate difficulty in social functioning and in maintaining concentration, persistence or pace. She found that Plaintiff retained sufficient mental capacity to perform operations of a routine and simple nature on a sustained basis, citing his range of daily activities, and his performance on testing in 2003 and in the 2007 mental status examination, with a GAF score of 57. She found that Plaintiff could concentrate on, understand, and remember routine and repetitive instructions. His moderately impaired ability to carry out tasks with adequate persistence and pace still permitted him to complete routine, repetitive tasks. She noted that Plaintiff could sustain an ordinary routine without special supervision and make simple work related decisions. Lastly, she found he could tolerate occasional contact with the general public, coworkers, and supervisors with adequate tolerance of minor changes in routine.

During subsequent therapy sessions with Ms. Ruebensam, Plaintiff's affect was flat or labile but he otherwise was attentive and cooperative and had good eye contact. (AR 433, 440, 441, 443). Plaintiff transferred from Ms. Ruebensam to Dr. Darlene Barnes in February 2009. (AR 433). Ms. Ruebensam again noted Plaintiff achieved most therapeutic goals. Plaintiff reported that he

interacted more with others and stayed positive. In March 2009, Plaintiff had a blunted affect with fair memory, concentration, insight, and judgment. He discussed a conflict with his dad, and between his parents, about whether he should work. (AR 425, 431). He guessed the economy was making it difficult for him to find work, stating he had filled out applications and reviewed newspaper ads for six months. (AR 427, 431). He talked loudly and became agitated during some questioning. (AR 425). He had a depressed or dysphoric mood, particularly in late April and May, with a blunted and flat affect and some distractibility. (AR 419).

In June 2009, Plaintiff reported that he was improving, without complaints of outbursts. (AR 406). Dr. Hunger assessed a level mood. Dr. Barnes encouraged Plaintiff to restart looking for work. (AR 407, 415, 399). In July 2009, Dr. Barnes noted Plaintiff showed more social skills and was more adaptable to social interaction (AR 399). He was more cordial and understanding, with normal mood, affect, cooperation, and attention in that month and other recent months (AR 399, 401, 404, 409, 411).

In August 2009, Plaintiff appeared somewhat anxious, with a euthymic mood and restricted affect. (AR 395). Concentration and memory remained good. He visited his grandmother three to five days per week at the nursing home. At the end of August, Dr. Barnes observed pressured speech, but Plaintiff was cooperative and attentive.

On December 1, 2009, Dr. Barnes completed a Mental Impairment Questionnaire, noting a GAF score of 57 and medications of Focalin, Geodon, and Zoloft. (AR 530). Dr. Barnes noted "looking through people" or a lack of eye contact, as well as a lack of reciprocity. She said Plaintiff might have unpredictable, inappropriate, or bizarre behaviors. She identified signs and symptoms including anxiety, poverty of content of speech, difficulty thinking or concentrating, easy

distractibility, secluseveness or autistic thinking, psychomotor agitation or retardation, and emotional lability.

For the table titled "mental abilities and aptitudes needed to do unskilled work," she checked the box for "unable to meet competitive standards" in most areas, including working with others without distraction, completing a normal workday or workweek without interruptions from symptoms, making simple work-related decisions, dealing with normal work stress, getting along with coworkers, setting realistic goals, or making plans independently. However, she also opined Plaintiff has "unlimited or very good" ability to maintain regular attendance and be punctual, as well as "sustain an ordinary routine *without supervision*." (AR 532) (emphasis added). Additionally, she found a "limited but satisfactory" ability to maintain attention for two hour segments and to carry out very short and simple instructions. On the table for "mental abilities and aptitude needed to do particular types of jobs," Dr. Barnes checked the box for "seriously limited, but not precluded" in interacting appropriately with the general public, maintaining socially appropriate behavior, and adhering to basic standards of neatness and cleanliness. (AR 533). She found a moderate restriction of activities of daily living as well as maintaining concentration, persistence, or pace, with a marked limitation of social functioning and three episodes of decompensation.

Between August 2009 and January 2011, there were no documented complaints, treatment, or abnormal mental status findings. Plaintiff restarted medication management with Dr. Candice Hunter on January 12, 2011, without any complaints. (AR 848). Plaintiff reported that, although he was not taking Focalin every day, his mood remained steady, without any bizarre behaviors or depression. Dr. Hunter found that Plaintiff had an appropriate affect and fair attention, concentration, insight, and judgment. Plaintiff's speech was monotone, but less loud.

Plaintiff returned to see Dr. Hunter five months later, on June 6, 2011. (AR 847). During that five-month period, there were no documented complaints or abnormal mental status findings. Plaintiff was working on being more social and active and did not have any behavior problems or depression. He was not compliant in taking Focalin. Plaintiff had good grooming and hygiene, euthymic mood, appropriate affect, and fair memory, concentration, insight, and judgment.

Between June 2011 and January 2012, there were no documented complaints, treatment, or abnormal mental status findings. On January 18, 2012, Plaintiff reported feeling alright but had a somewhat blunted affect with limited eye contact. (AR 845, 846).

A week later, on January 26, 2012, Plaintiff restarted therapy with Ms. Ruebensam. (AR 831-836). Plaintiff complained of occasional depression, anxiety, low energy, anger, and loss of interest in activities. He was attentive and cooperative with good eye contact and an elevated mood but with a labile affect. Ms. Ruebensam found a GAF score of 65, indicating only mild symptoms or some difficulty in school, occupational, or social functioning.

Over the course of the next ten months, Plaintiff saw Ms. Ruebensam anywhere from once per week during several months, as was recommended, to once every other month. (AR 803-36). In most therapy sessions, Plaintiff was attentive and cooperative with good eye contact but had a flat affect and depressed mood. His GAF score was either a 60 or 65. (AR 805, 806, 809, 811, 813, 815, 817, 821-830). He reported that he helped around the house, did lawn work, went for walks, and enjoyed reading books. (AR 814). In April 2012, he reported going out more often. (AR 827). Ms. Ruebensam recommended on many occasions that Plaintiff contact vocational rehabilitation for assistance in finding a job. (AR 816, 820, 826, 829).

On May 4, 2012, Plaintiff told Dr. Navakas, Plaintiff's treating psychiatrist, that he was doing fine and getting along with his family. (AR 843). Plaintiff denied problems interacting with others. He was mildly awkward introducing himself, but was euthymic, with appropriate affect. He had good activities of daily living. His memory was intact with good judgment and fair insight. Dr. Navakas assessed a GAF score of 70. Two months later, Dr. Navakas increased his GAF score to 75, with normal mood, affect, insight, judgment, attention, focus, and memory. Dr. Navakas remarked that Plaintiff connected well with people and initiated a good deal.

On August 23, 2012, Plaintiff had a consultative psychological examination with Dr. Patrick J. McKian. (AR 858). Plaintiff reported quitting his dishwasher job at Baker's Square because his manager was "on his case." (AR 859). Plaintiff discussed applying for jobs, but said he had not gotten called back. He said he had problems following directions, often was forgetful, and had a hard time being around large groups of people. He tried to make money by pet-sitting and by collecting cans. Dr. McKian found that Plaintiff had a full range affect and had a euthymic mood, although he presented as loud. Plaintiff made no errors on concentration tests, such as math calculation and serial sevens. He repeated six digits forward and four digits backwards and recalled two out of three items after five minutes. Dr. McKian found at worst mild to moderate limitations in all areas with Plaintiff mildly limited in understanding, remembering, and carrying out simple instructions. Plaintiff was mildly to moderately limited in interacting with supervisors and coworkers, and mildly limited in interacting appropriately with the public as well as responding appropriately to usual work situations and changes in a routine work setting.

Subsequent records from Dr. Navakas in September 2012 revealed stable and controlled symptoms, with a steady GAF score of 75. (AR 838). To Dr. Navakas, Plaintiff denied severe symptoms and had normal mood, affect, concentration, focus, and memory.

Plaintiff told Ms. Ruebensam that he was doing fairly well, but did not want to work part-time because he was afraid he would not be able to remember things and would become upset. (AR 804). He expressed fear about being alone, although he left the house frequently to run errands on his own. He was attentive and cooperative with good eye contact but had a flat affect and depressed mood.

The last therapist progress note from Ms. Ruebensam, dated November 8, 2012, discussed Plaintiff's concerns with focusing and following directions. (AR 802). Ms. Ruebensam encouraged him to learn to stay on a schedule, do some work around the house for his mom, and volunteer. On mental status, Plaintiff was attentive and cooperative, making good eye contact, albeit with a flat affect and depressed mood. Ms. Ruebensam gave Plaintiff a GAF score of 65 and noted that he had achieved most therapeutic goals.

Ms. Ruebensam submitted a Mental Residual Functional Capacity questionnaire on the same date, November 8, 2012. (AR 850-856). In contrast with her statements in her treatment notes that Plaintiff achieved most therapeutic goals, she opined that Plaintiff's response was "minimal." She identified numerous "signs or symptoms" but the clinical findings were normal for mood, affect, thought process, appearance, and orientation. (AR 850, 851). On the "unskilled work" table, Ms. Ruebensam found no useful ability to function in carrying out very short and simple instructions, maintaining attention for two-hours segment, completing a normal workday, accepting instructions, getting along with coworkers, maintaining socially appropriate behavior, and other areas. She stated

that due to his diagnosis, Plaintiff would have great difficulty with carrying out and remembering short and simple instructions, and thus could not maintain attention for two-hour segments.

Between November 2012 and April 2013, there is no documented treatment until a psychological consultation with Dr. Carl Hale on April 1, 2013. Plaintiff reported to Dr. Hale that his medication helped with his mood and that he could focus well on one thing at a time. (AR 870, 871). Plaintiff had no difficulty with most memory tasks or concentrating on serial sevens or math calculations. He was mildly anxious and dysphoric with a fixed gaze and loud speech. He was cooperative and established limited rapport. Dr. Hale found a GAF score of 55, indicating moderate symptoms or moderate difficulties in occupational, school, or social functioning. Dr. Hale opined that Plaintiff was either mildly or moderately limited in various facets of concentration, including handling simple instructions and making judgments on simple work-related decisions. Dr. Hale found that Plaintiff had difficulty with attention and executive functioning, with past problems in multi-step commands, and with filtering out distractions. He also found marked limitations in interacting with the public, coworkers, and supervisors. He did not cite specific objective findings and mentioned solely Plaintiff's "autism" diagnosis even though the previous records demonstrated an Asperger Syndrome diagnosis.

2.      *Testimony*

At the hearing, Plaintiff testified that he saw a psychiatrist (Dr. Navakas) every three months and a therapist weekly to treat his mental impairments, including Asperger Syndrome. He took medications such as Geodon and Zoloft without side effects and his condition improved with treatment. His mother, Mrs. Soga, testified that he had some mood swings, but "not terribly bad."

Plaintiff stated that he lived in a separate apartment in his parent's house. He alleged staying in his apartment "most of the day" and denied vacuuming, cooking, doing the laundry or paying bills. However, he indicated that he did some tidying up, drove, went shopping, cut the grass, took care of two dogs, and performed personal care activities. Mrs. Soga said that he "basically [took] care of his own apartment himself" although she often instructed him how to do things the right way. (AR 621). Plaintiff said he played video games for 12 hours per day and watched TV. Plaintiff denied going out to eat with family or having any friends. Mrs. Soga testified Plaintiff went out to eat with family, attended NASCAR races, and socialized around their swimming pool when they had people over. Mrs. Soga also acknowledged that, although Plaintiff did not have friends his own age, he did better with older people.

Mrs. Soga indicated that Plaintiff tried unsuccessfully to find work. In discussing work prior to his benefits application, Plaintiff said he worked at Baker's Square for a year and a half, the first few months with extra supervision ending when the supervisor left the job. His new boss reportedly yelled at him to wash and place dishes a certain way before letting him go. Plaintiff said he also worked for Target, where he brought in carts, picked up hangers, cleaned bathrooms and mopped the floor. Plaintiff said he would only bring in the carts and was let go after six weeks without explanation.

3.      *ALJ's Decision*

The ALJ gave examining neuropsychologist Robert Coyle "great weight," the opinions of Agency reviewers J.V. Corcoran and A. Dobson "great weight," Disability Determination Services (DDS) reviewers Dr. Shipley, and Dr. Pressnor "substantial weight," and medical expert Ellen Rozenfeld the "greatest weight." (AR 574). The ALJ gave treating psychologist Dr. Barnes' opinion

"little weight" where her opinion was inconsistent with the ALJ's RFC determination because her treatment notes did not contain specific findings sufficient to support her opinion. (AR 574-75). Examining physician Dr. Patrick McKian's opinion was given "little weight" as being too general, and examining doctor Dr. Hale was given "little weight" because his findings were unsupported by the record and did not contain specific findings. (AR 575). Treating therapist Donna Ruebensam's opinion was rejected as unsupported and Mrs. Soga's opinion was given little weight as unsupported and based on Plaintiff's subjective complaints. (AR 576). The ALJ also found Plaintiff capable of performing full-time work and that the reason Plaintiff had never maintained full-time employment was because of low motivation or inability to find work despite his efforts to do so. *Id.*

## ANALYSIS

In the instant appeal, Plaintiff argues that the ALJ committed reversible error in evaluating Plaintiff's residual functional capacity, by improperly weighing the opinion of his mother, and by failing to properly evaluate the medical opinions. The Court considers each of Plaintiff's arguments in turn, beginning with the weight to the opinion evidence.

### A. Testimony of Plaintiff's Mother - Mrs. Soga

Plaintiff argues that the ALJ erred in giving the testimony of his mother, Mrs. Soga, "little weight." In his decision, the ALJ reasoned that the "opinions expressed are unsupported by objective findings, and seem to be based on the claimant's subjective complaints." (Pl. Br. 12 (citing AR 576)). Notably, the ALJ gave little weight to the testimony of Mrs. Soga to the extent it would limit Plaintiff to less than simple work tasks with limited workplace interactions. The ALJ's finding that the evidence of record supported Plaintiff's ability to do unskilled work with limited workplace interactions is supported by substantial evidence.

In discussing Mrs. Soga's opinion, the ALJ followed SSR 06-03p for evaluating opinions and other evidence from sources that are not "acceptable medical sources." SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006). First, the ALJ noted that, in opining that Plaintiff will never be able to take care of himself, Mrs. Soga's reports "essentially reiterate" Plaintiff's testimony. The ALJ gave the example that Mrs. Soga reports memory problems as does Plaintiff yet every examination of record shows intact memory and ability to calculate. The ALJ explained that, while Mrs. Soga's subjective observations are useful, they must correspond with the objective medical findings. Also, the ALJ noted the conflict between Mrs. Soga's opinion and Plaintiff's father's opinion that Plaintiff can work full time if he wants to. Thus, because Mrs. Soga's opinions about Plaintiff's memory problems are not supported by the medical testing, the ALJ gave them little weight.

Plaintiff argues that Mrs. Soga's testimony is supported by the findings of Ms. Ruebensam who Plaintiff says noted difficulties in independent functioning and setting goals. But, as noted in more detail below, most of the cited pages do not contain such findings. The mental status exams by Ms. Ruebensam did not find that Plaintiff had difficulty with independent functioning and setting goals in any of the pages that Plaintiff cites. *See* (AR 438, 442, 454, 456, 460, 463, 465, 470, 472-73, 476, 478-79, 802, 808-12). Rather, any such notation was a summary of Plaintiff's own statements. In one report, Ms. Ruebensam wrote that Plaintiff "[s]tates that he . . . gets lost when there is no one around to give him direction," which is an example of a subjective report from the Plaintiff rather than an objective finding. (AR 808). Ruebensam did not discuss observations or examination findings that demonstrated problems with setting goals or functioning independently.

Plaintiff also argues that Mrs. Soga's opinion is consistent with Dr. Barnes' notations that Plaintiff has difficulty behaving in a socially appropriate manner. (AR 399, 407, 409, 411, 413, 417,

419, 421, 429, 431). But, behaving in a socially inappropriate manner does not mean that Plaintiff cannot follow or remember instructions. And, some of the records showed positive mental status examinations, such as appropriate affect and no noted behavioral abnormalities. *See* (AR 399-401, 407-412, 417, 421). Notably, the ALJ accommodated Plaintiff's social and communication difficulties in formulating an RFC based on moderate limitations in social functioning by limiting Plaintiff to an occupation with only occasional coworker contact and occasional supervision and only superficial contact with the public on routine matters. (AR 567, 571). Notably, Dr. Barnes, like Ms. Ruebensam found that Plaintiff achieved most therapeutic goals, as discussed by the ALJ. (AR 571).

Finally, Plaintiff notes that Dr. Barnes and Dr. Hale opined that Plaintiff had marked limitations in social functioning. However, as found below, the ALJ properly weighed Dr. Barnes' opinion when he gave it little weight. And, the ALJ gave little weight to Dr. Hale's opinion, which Plaintiff does not challenge.

Plaintiff also argues that the ALJ wrongly discredited Mrs. Soga's opinion on the basis that it relied on Plaintiff's subjective complaints because Mrs. Soga's testimony was also based on her own difficulties supervising Plaintiff, Plaintiff's need for repeated instructions to do basic cleaning, and the conversation Mrs. Soga had with a former manager of Plaintiff's that he could not "babysit" Plaintiff while at work. (AR 617-23). Early in the application process, Mrs. Soga filled out forms indicating that Plaintiff needs reminders to shower, shave, take medication, and clean. She also indicated, by circling options on a preprinted form, that Plaintiff has an impaired ability to concentrate, follow instructions, and complete tasks. (AR 189). While it is true that, pursuant to SSR 06-3p, Mrs. Soga's testimony may be of particular value because it "may be based on special

knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function," the overall record, including the numerous mental examinations, contradict her opinion of extreme limitations in ability to follow instructions and interact socially. Remand is not warranted.

## B. Weight to Treating Opinions

Plaintiff argues that the ALJ did not properly weigh the opinions of his treating licensed social worker, Ms. Ruebensam, and his treating psychiatrist, Dr. Barnes. In determining whether a claimant is disabled, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence . . . received." 20 C.F.R. § 416.927(b). And, the ALJ evaluates every medical opinion received. 20 C.F.R. § 416.927(c). This includes the opinions of nonexamining sources such as state agency medical and psychological consultants as well as outside medical experts consulted by the ALJ. *Id*. § 416.927(e)(2).

An ALJ must give the opinion of a treating doctor controlling weight if (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques" and (2) it is "not inconsistent" with substantial evidence of record. *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *see also Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). If an ALJ determines that controlling weight is not appropriate, the ALJ must then decide what weight to assign to the opinion. 20 C.F.R. § 416.927(c);SSR 96-2p, 1996 WL 374188 (Jul. 2, 1996); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

To make that decision, the ALJ considers several factors for weighing all opinion evidence, including the opinions of state agency physicians and psychiatrists as well as medical experts sought

by the ALJ and "must explain in the decision the weight given" to each. 20 C.F.R. § 416.927(e)(2)(ii), (iii); *Scrogham v. Colvin*, 765 F.3d 685, 697-98 (7th Cir. 2014); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th 2008). First, more weight is given to a source that has examined the claimant than one who has not. 20 C.F.R. § 416.927(c)(1). Second, treating sources are given more weight than other sources, and a number of subfactors are considered. 20 C.F.R. § 416.927(c)(2). Third, the ALJ considers supportability, which gives more weight to opinions that present relevant evidence, particularly medical signs and laboratory findings, in support of the opinion. 20 C.F.R. § 416.927(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion. . . . We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources."). Fourth, "the more consistent an opinion is with the record as a whole, the more weight [is given] to that opinion." 20 C.F.R. § 416.927(c)(4). Fifth, more weight is given to a specialist about medical issues related to the area of specialty than to the opinion of a source who is not a specialist. 20 C.F.R. § 416.927(c)(5). Finally, other factors are considered as brought to the attention of the ALJ or of which the ALJ is aware, such as the doctor's understanding of the disability programs and their evidentiary requirements as well as familiarity with information in the claimant's case record. 20 C.F.R. § 416.927(c)(6).

1.    *Ms. Ruebensam*

Ms. Ruebensam is a licensed clinical social worker who provided therapy to Plaintiff. Thus, contrary to Plaintiff's suggestion, Ms. Ruebensam is not a "treating source" because a licensed clinical social worker is not an "acceptable medical source." SSR 06-03p; 20 C.F.R. §§ 416.902, 416.913(a). Only "medically acceptable sources" can be considered "treating sources." 20 C.F.R.

§§ 416.902, 416.927(d). Nevertheless, under SSR 06-03p, the ALJ may use evidence from "other sources," such as Ms. Ruebensam, which "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, at *2. When weighing "other sources," the ALJ uses the same factors used to evaluate acceptable medical sources. *Id*. The opinion of an "other source" who has professionally seen a claimant can outweigh other medical opinions "under certain circumstances . . . . For example, this could occur if the 'non-medical source' has seen the individual more often and has greater knowledge of the individual's functioning over time and if the 'non-medical source's' opinion has better supporting evidence and is more consistent with the evidence as a whole." SSR 06-03p. The weight given to these opinions is left to the discretion of the ALJ. *Id*.

In this case, the ALJ properly considered the factors under 06-03p of the nature and extent of the relationship between Ms. Ruebensam and Plaintiff, Ms. Ruebensam's qualifications and area of specialty or expertise, the degree to which Ms. Ruebensam presents relevant evidence to support her opinion, and whether the opinion is consistent with other evidence. The ALJ recognized that Plaintiff had attended 36 therapy sessions with Ms. Ruebensam by January 2009, noting that Ms. Ruebensam is a licensed social worker, and had additional therapy sessions in 2012. The ALJ noted that Ms. Ruebensam opined in November 2012 that Plaintiff "essentially had no useful ability to function in most mental abilities and aptitudes needed to do unskilled work." The ALJ gave those opinions no weight because they are in "stark contrast" to the "normal findings" of Ms. Ruebensam's treatment notes and Plaintiff's improving GAF scores. The ALJ found that there was no support in the record for such extreme limitations. (AR 576). Also, earlier in the decision, in summarizing the medical evidence, the ALJ noted that Ms. Ruebensam's "treatment notes indicate

generally normal findings and document the claimant's unremarkable reports." (AR 571). The ALJ noted that there were no records documenting current treatment from Ms. Ruebensam since November 2012, even though Plaintiff maintained that he was still seeing her. (AR 575, 572). Although the ALJ described the records as "unremarkable," (AR 571), the ALJ also noted the findings of "depressed mood." *Id*. The ALJ spent three pages summarizing the medical evidence. The ALJ considered all of Plaintiff's symptoms and the objective findings such as social awkwardness, mood problems, and loud expression. (AR 567, 570-73).

Although Ms. Ruebensam assessed "no useful ability to function" or "unable to meet competitive standards" in almost every mental function category for performing unskilled work, her own treatment notes indicated largely normal findings and improving GAF scores, which the ALJ noted. The ALJ summarized Ms. Ruebensam's treatment records from 2012 that reported a GAF increasing from 60 to 65, which indicates only mild symptoms or some difficulty in functioning in social or occupational settings. (AR 571, 802-04, 821, 836). Notably, these GAF scores were lower than those of 70 to 75 given by Plaintiff's treating psychiatrist, Dr. Navakas, during the same time period, which the ALJ also noted. *See* (AR 571, 844, 841-42). On July 2, 2012, and September 28, 2012, Dr. Navakas gave Plaintiff a GAF of 75. A GAF score between 71 and 80 indicated symptoms of a transient and less than mild nature. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th ed. 2000) ("DSM IV-TR").

Plaintiff does not offer any specific quotations from Ms. Ruebensam's treatment records to support his contentions; rather, he makes a general statement that the records often included notes of depression and anxiety and difficulty initiating and sustaining activity and then string cites several pages, which often do not support his contention. *See, e.g.*, (Pl. Br. 14 (citing AR 438, 442, 454, 456,

460, 463, 465, 470, 472-73, 476, 478-79, 802, 808-12)). The evidence Plaintiff cites regarding difficulty independently initiating and sustaining activity is based upon self-reported complaints from Plaintiff in 2008 and 2009 and not from objective findings such as observations or mental status examinations.

In most of the recent treatment notes that were contemporaneous with her opinion, Ms. Ruebensam noted that Plaintiff was attentive and cooperative with good eye contact. (AR 571, 576, 802, 805, 806-836). Plaintiff's complaints were unremarkable in relation to his mental impairment, with complaints such as a cold. (AR 571, 818, 820). Ms. Ruebensam repeatedly opined that Plaintiff achieved most therapeutic goals, including on the same day that she gave her opinion. (AR 572, 802-04). Plaintiff sought Ms. Ruebensam's help in finding a job and Ms. Ruebensam recommended that Plaintiff contact vocational rehabilitation for assistance. (AR 571, 573, 816, 820, 826, 829).

Plaintiff notes that the ALJ relied on Dr. Navakas' opinion that Plaintiff had a GAF of 65-70 as signs of improvement, *see* (AR 572), but then argues that the ALJ ignored Dr. Navakas' notes of "target symptoms" of mood swings, agitation, inability to connect and maintain social connections, low energy, hopelessness, helplessness, despondency, sadness, psychotic symptoms, and suicidality. (AR 837-42). In that same record, Dr. Navakas indicated that Plaintiff was being treated for Asperger Syndrome and major depression. Dr. Navakas noted under "Status of Progress," that Plaintiff has been stable over the last three months, that Plaintiff denied all mania, that there was no mania at the visit, that Plaintiff denied all despondency and all suicidality, and that Plaintiff was able to maintain a reasonable connection with Dr. Navakas during the extended interview. Dr. Navakas found that Plaintiff's memory was intact, that his concentration and focus were preserved, and that his cognitive processes were preserved. Dr. Navakas found Plaintiff stable and found no need to

24

change his medications. In this instance, "target symptoms" are "symptoms of an illness that are most likely to respond to a specific treatment, such as a particular psychopharmacological drug." *See* http://medical-dictionary.thefreedictionary.com/target+symptoms. The ALJ did not err in his review of Dr. Navakas' opinion.

The ALJ gave good reasons for rejecting the extreme limitations in Ms. Ruebensam's opinion, namely that the opinion conflicted with not only the objective evidence of record but even with Ms. Ruebensam's own GAF scores, and the ALJ sufficiently explained his reasoning. Contrary to Plaintiff's assertion in her reply brief, the ALJ did not draw his own medical conclusions, but rather considered whether the opinion was supported by the record evidence as required under the statute and regulations.

2. *Dr. Barnes*

Plaintiff argues that the ALJ failed to give "good reasons" for discounting the opinion of Dr. Barnes. Dr. Barnes saw Plaintiff on at least eighteen occasions and provided therapy and coaching on mood swings, social functioning, and low motivation. Plaintiff argues that Dr. Barnes' opinions that Plaintiff has impaired ability to function independently, behave appropriately, or meet the minimum standards required for work are consistent with the opinions of Ms. Ruebensam, Mrs. Soga, and "the fact that Plaintiff had been fired from multiple jobs for an inability to meet minimum standards, one of which, not even being retained after the probationary period." (Pl. Br. 16). Based on the testimony of Mrs. Soga and Plaintiff, Plaintiff was fired from his job at Target, but there is conflicting evidence about why he stopped working at the dishwashing job at Bakers Square, which he held for eighteen months. Regardless, as discussed above, the ALJ properly discounted the severe limitations opined to by Ms. Ruebensam and Mrs. Soga for the same reasons that the ALJ properly

discounted Dr. Barnes' opinion of marked limitations as to social functioning and for instruction and/or supervision.

First, the ALJ stated that no specific treatment notes support Dr. Barnes' opinion. (AR 575). The ALJ discussed the lack of examination findings supporting a "marked" difficulty in social functioning or other evidence to support three episodes of decompensation, each of two weeks' duration. *Id.* The ALJ noted that there were no documented episodes of decompensation in the record; and Plaintiff has not identified any.

Second, the ALJ found that Dr. Barnes' opinions "seemed internally inconsistent because she opined the claimant is seriously limited but not precluded from meeting competitive standards for interacting socially and maintaining appropriate social behavior but also opined he is unable to meet competitive standards." (AR 575 (citing Ex. 19F/4, 5)). Indeed, in the table for "mental abilities and aptitudes needed to do unskilled work," Dr. Barnes checked the box for "unable to meet competitive standards" in several categories such as working with others or in getting along with coworkers without undue distraction or exhibiting behavioral extremes; yet, in a subsequent table for "mental abilities and aptitude needed to do particular types of jobs," the ALJ also checked the box for "not precluded from meeting competitive standards" in the categories of interacting socially and maintaining appropriate behavior. (AR 575, 532-33). These opinions indeed appear internally inconsistent, especially given that the first table is for mental abilities needed to do only unskilled work. The Court finds that the ALJ did not manufacture a conflict as asserted by Plaintiff.

Notably, this is just one of many factors considered by the ALJ. The ALJ immediately went on to reason that Plaintiff "does have limited social and stress tolerance but there is insufficient objective evidence that he is unable to tolerate even low stress work and occasional social

interaction at work. The record is devoid of objective findings to preclude ability for regular attendance, dealing with any work stress, and remembering work procedures." (AR 575 (citing Ex. 19F/4)). Plaintiff does not identify any findings of Dr. Barnes that support such severe limitations.

And, the ALJ noted that, by May 2009, Dr. Barnes had found that Plaintiff met most therapeutic goals. That was a finding that Dr. Barnes repeated in subsequent reports. (AR 571, 420, 415, 413, 411, 409, 407, 404, 401, 399). After August 2009, there was no treatment with Dr. Barnes, who gave her opinion in December 2009.

Plaintiff argues that, if the ALJ did not understand how the notes support the opinion, the ALJ should have recontacted Dr. Barnes for a more complete explanation. *See* SSR 96-5p, 1996 WL 374183 (July 2, 1996); *Barnett*, 381 F.3d at 669. Such a decision is within the discretion of the ALJ. *See Wilcox v. Astrue*, 492 F. App'x 674, 678 (7th Cir. 2012) ("[T]he need for additional tests or examinations will normally involve a question of judgment, and we generally defer to the ALJ's determination whether the record before [him] has been adequately developed."). "An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); 20 C.F.R. § 416.912(e). As Plaintiff is represented by counsel, the burden is on Plaintiff to introduce objective evidence indicating that further development is required. *Wilcox*, 492 F. App'x at 687 (citing *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009)). This is not a case in which laboratory results are obscure or unclear in meaning. *See* SSR 96-2p. Plaintiff does not point to any objective evidence in Dr. Barnes' records that the ALJ misunderstood or that was obscure. And, the ALJ sufficiently explained the reason for the weight given to Dr. Barnes' opinion.

The Court finds that the ALJ offered good reasons for giving little weight to the December 2009 opinion of Dr. Barnes and that the weight given is supported by substantial evidence.

## C. Residual Functional Capacity

Plaintiff argues that, in formulating the Residual Functional Capacity ("RFC"), the ALJ failed to account for evidence of the severity of Plaintiff's impairments in combination. The RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. § 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 416.927(e)(1); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at steps four and five of the sequential evaluation process and must be supported by substantial evidence. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996); *Clifford*, 227 F.3d at 870.

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p at *1. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, at *3. The relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id*. at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id*. The "ALJ must also consider the combined effects of all the claimant's

impairments, even those that would not be considered severe in isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003).

First, Plaintiff argues that the ALJ failed to account for "significant evidence [of] Plaintiff's inability to sustain focus and complete even simple work activities absent close supervision." (Pl. Br. 7). Plaintiff asserts that the record supports a finding that Plaintiff would be unable to sustain an ordinary routine without extra supervision and that the ALJ failed to address this evidence. In support, Plaintiff cites the August 22, 2012 notation by Ms. Ruebensam that Plaintiff feels lost when his parents are absent and that he needed someone to give him direction. (AR 808). On August 13, 2012, Ms. Ruebensam also noted that Plaintiff reported that he has increased anxiety when he is alone and that his mind wanders when he is alone. (AR 810). Plaintiff notes that these comments are consistent with his mother's testimony that despite twelve years of living in a separate space in the home, he still needed to be supervised and instructed on the particulars of any required cleaning or maintenance in the home. (AR 621). These statements, for the most part, are Plaintiff's reports to Ms. Ruebensam during sessions and are not findings by Ms. Ruebensam. And, as discussed in more detail below, these reports conflict with objective testing and other accounts of Plaintiff's activities.

Plaintiff also reasons that these statements are consistent with his work history, which he says included being fired from a department store after the probationary period because he could not keep track of multiple tasks. (AR 612-13). Plaintiff also notes that he testified that he was "let go" from his position as dishwasher, which he held for eighteen months, because he could not independently transition between routine tasks such as washing dishes, mopping the floor, and taking out the trash. (AR 609-11). In contrast, Plaintiff told both Dr. Rini in 2007 and Dr. McKian

in 2012 that he left the dishwashing job because he had a disagreement with the manager about his job responsibilities.

As discussed above, the ALJ properly weighed Mrs. Soga's testimony and gave it little weight. Even if the ALJ had adopted it, Mrs. Soga's opinion did not establish the need for supervision in all unskilled work. There were many tasks Plaintiff performed for which he did not allegedly need supervision, such as cooking, shopping, driving, taking care of dogs, and helping his grandmother with her chores.

Plaintiff notes that treating therapist Dr. Barnes found in the December 1, 2009 mental impairment questionnaire that Plaintiff would have difficulty setting realistic goals and working independently of others. However, this finding is made in the box for "mental abilities and aptitudes needed to do semiskilled and skilled work." (AR 533). The ALJ gave Plaintiff an RFC for unskilled work. Also, as discussed above, the ALJ did not err in giving Dr. Barnes' opinion little weight. Notably, in the chart for "mental abilities and aptitudes needed to do unskilled work," Dr. Barnes indicated that Plaintiff could carry out very short and simple instructions, could maintain attention for two hour segments, could maintain regular attendance and be punctual within customary, usually strict tolerances, and could "sustain an ordinary routine without special supervision." (AR 532).

Plaintiff contends that Ms. Ruebensam repeatedly noted Plaintiff's difficulty with motivation, expectations, and ability to set goals independently. (Pl. Br. 8 (citing AR 438, 442, 454, 456, 460, 463, 470, 472-73, 476, 478-79)). However, some of those treatment records do not identify any of those asserted difficulties. *See, e.g.*, (AR 463, 465, 470). And, other records state the opposite. For example, on July 22, 2008, Ruebensam noted that Plaintiff "is still very motivated for change." (AR 460). On May 27, 2008, Ms. Ruebensam noted that Plaintiff felt "down" when

speaking of his future goals, which suggests that he had made future goals. (AR 463). And on December 1, 2008, Plaintiff Ruebensam noted that Plaintiff "focused on setting a goal to obtain a job." (AR 442). Plaintiff repeatedly told Ruebensam that he would like to work or that he would like to be busy. *See, e.g.*, (AR 545, 472).

Plaintiff argues that the ALJ failed to consider the impairments in combination because he limited Plaintiff to simple, repetitive work but also precludes the possibility of the supervision that Plaintiff would require to complete those tasks because the RFC limits Plaintiff to "only occasional coworker contact and supervision." (AR 568). Plaintiff argues that the ALJ provided no explanation for how a person that required continual supervision to complete routine tasks and had a history of being fired for failure to complete routine tasks without supervision, would be able to sustain a regular routine while being supervised no more than a third of the work day.

First, the ALJ gave great weight to Dr. Rozenfeld, the expert psychologist, who remarked that Plaintiff can "follow and sustain an ordinary routine without special supervision." (AR 389, 574). The ALJ also gave great weight to the state agency opinions of William Shipley, Ph.D. and Joseph Pressner, Ph.D., who agreed that Plaintiff's ability to sustain an ordinary routine without special supervision was "not significantly limited." (AR 364, 383, 574). Plaintiff has not shown that the reliance on the opinions was faulty.

Plaintiff argues that the failure to consider his need for supervision and the finding of occasional contact with supervisors is not harmless because they are in direct conflict. Plaintiff notes that Dr. Barnes opined on December 1, 2009, that Plaintiff would have difficulty with criticism. (AR 532). And, the record supports Plaintiff's inability to sustain ordinary relationships or behave appropriately in social situations due to his Asperger Syndrome. (Pl. Br. 9 (citing AR 293, 399-401,

407-13, 417-19, 421, 429-31)). While the record indicates Plaintiff's inability to sustain ordinary relationships and some difficulty with appropriate behaviors, it does not indicate an inability to behave appropriately all the time or for sustained periods of time. In fact, the record shows that he socializes with family and friends. He also worked for eighteen months as a dishwasher at Baker's Square. And, Dr. Barnes, after several months of treatment, noted that he "seems to be showing more social skills and is more adaptable to social interaction skills in general." (AR 399). Plaintiff notes that Dr. Barnes and Dr. Hale opined that Plaintiff has "marked" limitations in maintaining social functioning. (AR 534, 867). But, the ALJ properly gave those opinions little weight on that point.

Plaintiff contends that every agency consultant and examining doctor that rendered an opinion on Plaintiff's social impairments opined that Plaintiff had at least a moderate impairment in social functioning. (AR 365-66, 378, 382-83, 389, 862-63). Even, Dr. Coyle, to whom the ALJ gave great weight, opined the Plaintiff may have difficulty with instructions on the job and showed signs of an emotional maladjustment disorder. (AR 283, 285). Dr. Coyle said he "may have *some difficulty* following verbal directions on the job." (AR 283) (emphasis added). But, Dr. Coyle did not say that the difficulty with following verbal instructions precluded handling even simple and repetitive instructions in the context of unskilled work. Dr. Coyle said, "he is starting to show signs of increased tension and increased maladjustment" and that he has "a significant level of emotional maladjustment that requires supportive services." (AR 285). The ALJ accommodated this limitation in the RFC.

There is not an irreconcilable conflict between Plaintiff's need for simple instructions and guidance and Plaintiff's social difficulties. The factual record and opinion evidence do not illustrate

an inability to accept instructions, particularly when the instructions are of a short, simple, and repetitive nature, as required in the RFC. Finding Plaintiff unable to carry out simple instructions is against the manifest weight of the evidence. Even Dr. Barnes' treating psychological opinion, which Plaintiff argues should be given more weight, states that Plaintiff had a "limited but satisfactory" capacity in this area. (AR 532). Dr. Rozenfeld, Dr. Shipley, and Dr. Pressner, found no limitation in understanding, remembering, and carrying out simple instructions. In limiting Plaintiff to short, simple, and repetitive instructions with set routines and procedures and few changes during the workday, the ALJ's RFC finding sufficiently accounted for any deficits in following instructions, including Dr. Coyle's finding of "some difficulty" with verbal instructions. This case is distinguishable from *Young*, 362 F.3d at 1002-03, cited by Plaintiff, in which the plaintiff's impairments were supported by substantial evidence in the record.

As for Plaintiff's work history, the ALJ discounted Plaintiff's inability to sustain even part time work because "[t]here is insufficient evidence concerning his alleged failures at work." (AR 576). Plaintiff criticizes the ALJ for not naming any evidence that conflicts with Plaintiff's testimony or his mother's testimony that he "was repeatedly fired for an inability to sustain even part-time unskilled employment." (Pl. Br. 11). Based on Plaintiff's and his mother's testimony, Plaintiff was fired from one job—his job at Target. Plaintiff fails to note the conflicting evidence as to whether he quit his job at Baker's Square or whether he was let go. Although he testified at the hearing that he was let go, in 2009 and 2012, he reported to consultative examiners that he quit after a dispute with a supervisor. And, Plaintiff reported that he quit a job at Regis because it involved too much driving. (AR 361, 570). Indeed, as stated by the ALJ, the record lacks evidence from Plaintiff's employers or vocational rehabilitation regarding the reasons his employment ended.

The ALJ also noted that Plaintiff volunteered at a hospital, watched other people's pets, and collected cans. Plaintiff did not allege any problems performing these other tasks or that he needed special supervision. Thus, Plaintiff's work history, the opinion evidence, and the medical evidence do not support the need for close supervision in an unskilled work setting.

Plaintiff argues that the ALJ "found that Plaintiff had sustained part-time work in the past, and thus, he should be capable of maintaining full-time work." (Pl. Br. 11 (citing AR 576)). But, the ALJ never said this. The ALJ did not assume that just because Plaintiff worked part-time in the past meant he could work full-time.

Plaintiff also criticizes the ALJ for finding that the only reason Plaintiff had not found full-time employment was low motivation "due to the bad economy." (AR 573). However, the ALJ wrote:

> In fact, the most that can be credited based on the claimant's treatment records is a waxing and waning of symptoms of depression, and a developmental disorder that did not prevent the claimant's search for jobs but then he apparently became less motivated due to the bad economy and was asking help getting job interviews from his therapist.

(AR 573). The ALJ noted that Plaintiff and his mother said in June 2006 and March 2009 that he "was unable to find a job" and "was disappointed because he had not found a job and guessed it was just the economy." (AR 293, 427, 431, 570, 571). In March 2009 treatment notes, Plaintiff "stated that for six months he looked in the newspaper and went and filled out applications and was not successful in finding employment." (AR 431). None of this supports Plaintiff's contention that his mental symptoms precluded employment.

Plaintiff says that the ALJ mischaracterized the record because Plaintiff's reduced motivation is really due to depression. (AR 479). But, the cited evidence does not say that he lacks motivation

due to depression. Rather, Ms. Ruebensam wrote, "Patient seems very resistant to change and admits to be comfortable with 'status quo.'" (AR 479). And again, Plaintiff asserts that the record evidence indicates that Plaintiff has "significant difficulty with realistic expectations and setting goals." (Pl. Br. 11 (citing AR 438, 442, 456, 460, 463, 465, 470, 472-73, 476, 478-79)). But, again, many of these pages do not address or comment on any unreaslistic expectations or difficulty setting goals. *See, e.g.*, (AR 442, 456, 460, 463, 465, 470, 472, 473, 476 ). For example, in the treatment record dated May 13, 2008, Ms. Ruebensam writes, "Discussed patient becoming involved with vocational rehab and being assertive with what expectations he cannot fulfill." (AR 465). She also wrote, "Therapist recommended patient continue to set small goals such as trying to spend more time out of the home. Joining a fitness club still encouraged. Patient seems to be developing more confidence/motivation." (AR 465). The treatment record that discusses "lack of motivation in making changes and/or setting goals discussed" is only the first treatment record dated February 4, 2008. And, the treatment record from January 19, 2009, mentions setting goals in this context: "Therapist recommends patient . . . try and not set unrealistic goals and/or expectations for himself." (AR 438).

The ALJ concluded that Plaintiff's extensive activities—among them playing video games for 12 hours a day and watching TV—belie a greater functionality and undermine claims of a significant (i.e. more than moderate) limitation in concentration or persistence. (AR 566, 567, 576, 604). Plaintiff criticizes the ALJ for finding that Plaintiff's activities of watching television and playing video games demonstrates an ability to sustain employment but for providing no explanation for how those activities translated into work. (AR 576). Plaintiff argues that the record does not show that he performed those activities in two-hour segments or any evidence that would translate

into functional abilities. However, as the Commissioner notes, if Plaintiff slept through the night when treated, and he is playing video games 12 hours a day as well as watching TV, it would be mathematically impossible for him not to be playing video games for a least one two-hour segment. And, this was just one factor. The ALJ also noted that the Plaintiff has no more than moderate difficulty with concentration at the hearing, his intact memory, and his ability to calculate and concentrate in mental status examinations and standardized tests. And, Dr. Rozenfeld, Dr. Shipley, and Dr. Pressner gave opinions that Plaintiff could maintain attention and concentration while performing simple, repetitive tasks on a sustained basis. (AR 364, 366, 389, 574). The ALJ's finding that Plaintiff does not have greater than moderate difficulties with concentration, persistence, or pace is amply supported.

Overall, Plaintiff's argument that the RFC should reflect a need for close supervision, an inability to follow instructions, or greater deficits in concentration are not supported by either the opinion evidence or the record. Plaintiff has not met his burden of demonstrating that the RFC is not supported by substantial evidence or that greater restrictions are necessary.

**CONCLUSION**

Based on the foregoing, the Court hereby **DENIES** the relief sought in the Plaintiff's Brief in Support of Motion for Summary Judgment [DE 17]. The Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Defendant Commissioner of Social Security and against Plaintiff. Richard W. Soga Jr.

So ORDERED this 28th day of September, 2016.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY

36

UNITED STATES DISTRICT COURT